## A96A1481, A96A1482. UNITED ACOUSTICAL & DRYWALL SYSTEMS, INC. v. FIDELITY & CASUALTY COMPANY OF NEW YORK; and vice versa.
### (476 SE2d 277)

POPE, Presiding Judge.

These appeals involve a premium on a workers' compensation insurance policy which United Acoustical & Drywall Systems, Inc. ("United") obtained from Fidelity & Casualty Company of New York ("Fidelity"). In Case No. A96A1481, United appeals from the judgment in Fidelity's favor; in Case No. A96A1482, Fidelity cross-appeals. For the reasons set forth below, we reverse the judgment in Case No. A96A1481 and affirm the judgment in Case No. A96A1482.

On August 18, 1994, Fidelity filed its complaint against United, alleging that United was indebted to it for various premium payments totaling $40,351, plus prejudgment interest and court costs. It was undisputed that Continental Insurance Company issued a workers' compensation insurance policy for United through Fidelity for the period October 1, 1989 through October 1, 1990. The policy was an assigned risk pursuant to the Georgia Workers Compensation Plan. The *estimated* annual premium for the policy was $6,943. Nevertheless, the policy contained a provision by which the *actual* premium due would be calculated based on a final audit of United, which was to be undertaken by Fidelity.

The policy stated that the premium shown on the information page was an estimate and that the "final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. . . ." The policy further stated: "You [the insured] will keep records of information needed to compute premium. You will provide us with copies of those records when we ask for them." Regarding audits, the policy stated: "You will let us examine and audit all your records that relate to this

policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium." The policy stated that "premium for this policy will be determined by our manuals of rules, rates, rating plans and classifications. We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance."

Fidelity performed an interim audit on United on April 27, 1990.[1] As a result of that audit, Fidelity issued an endorsement charging United an additional annual premium of $35,008. On August 1, 1990, Fidelity charged a further premium of $991. The policy was extended for the term of October 1, 1990 through October 1, 1991, and was cancelled on February 5, 1991.[2] United does not contest the outstanding balance owed on the $3,851 premium charged for this period, and thus, we will not address it here. It is undisputed that Fidelity never performed a final audit at the conclusion of the October 1989-1990 policy period.

After Fidelity filed its complaint, United answered and filed a motion for protective order, arguing that Fidelity was barred from performing an audit since its request was more than three years after the end of the policy term, as provided for in the policy. Fidelity opposed United's motion and filed the affidavit of its attorney, in which he swore that the premiums claim had been the subject of a May 1993 lawsuit, which suit was dismissed without prejudice based on an agreement in which United agreed to make its payroll records available. From the letters attached to his affidavit, it appears that United did not allow the audit to occur. In a second affidavit opposing the protective order, an insurance officer stated that in order to verify the premium due, it was necessary for United to provide certain records to Fidelity.

Fidelity then filed a motion for summary judgment, accompanied by the affidavit of Continental's regional audit manager, who stated that United owed $38,313 for the disputed period. This representative then stated: "[o]rdinarily, [Fidelity] would have conducted an audit after expiration of the term, October 1, 1989 through October 1, 1990. One of [Fidelity's] former employees, Gwen Morris, reported to [Fidelity] that an audit had been done when in fact one

---

[1] Prior to this, the policy was cancelled briefly for nonpayment of premium but was reinstated immediately once the premium payment was received.

[2] For this period, Fidelity audited United's payroll in July 1991 and sent United an audit statement for $3,851.

had not. [Fidelity] believed that a final audit had been performed. After [Fidelity] discovered that there had been no final audit for the term October 1, 1989 through October 1, 1990, [Fidelity] asked [United] to perform an audit. [United] agreed but [United] is now either unwilling or unable to cooperate in an audit." Fidelity also attached the affidavit of an auditor for Continental in which he stated that he conducted an audit of United's payroll, based on data provided by United, for October 1, 1989 to April 1, 1990.

United also filed a motion for summary judgment, arguing that it was entitled to summary judgment on all of Fidelity's claims for the disputed premium. United argued that no final audit had been conducted, that the first request for a final audit came in February 1994, and that, accordingly, it owed no premium. Fidelity filed a response, arguing that United's agreement in February 1994 to an audit barred its later refusal.

The day before the hearing United filed the affidavit of its president, Robert Coker, which stated that the interim auditor reviewed a summary of job categories but did not review payroll records, tax forms, or job records. Coker stated that he had never received a request from Fidelity to perform a final audit. He also stated that he had received correspondence from a Fidelity agent which stated: "there is obviously a mistake on 10/1/89 to 10/1/90 amount due. Please send to us all back up information." The same day United also filed the affidavit of its attorney, J. Ed Segraves, in which he stated that he received a letter from Fidelity indicating that a final audit had been prepared on December 7, 1990.

The court heard argument on the motions and determined that it would not consider the untimely affidavits of J. Ed Segraves and Robert Coker. The court denied United's motion for summary judgment; granted Fidelity's motion for the undisputed amount for the period from October 1990 to February 1991; granted Fidelity's motion as to half of the additional premium it claimed was due for the October 1989 to 1990 period based on the interim audit; and granted Fidelity's motion for summary judgment as to the unpaid portion of the original (estimated) premium minus the amounts United had paid. The court entered final judgment in favor of Fidelity on the principal of $19,818 and interest at a rate of 18 percent, totaling $17,536.30. The court concluded that a factual issue remained regarding the last six months of the period in dispute — from April to October 1990.

### Case No. A96A1481

1. We conclude that the state court erred in granting summary judgment to Fidelity. Although the court below interpreted the interim audit as a final audit for the period October 1989 through

April 1990, there was ample evidence that the interim audit did *not* constitute a final audit to determine the final premium. Although the policy provided for audits during the policy term, its clear terms stated that the final premium would be determined *after* the conclusion of the policy term. Second, there was evidence that Fidelity's failure to conduct the final audit was a mistake, and that the failure was attributable to Fidelity's erroneous impression that a final audit had been performed. Finally, there was evidence that even Fidelity considered the interim audit a "test audit," and not the basis for the calculation of the final premium.

Therefore, even in the absence of the affidavits which the court excluded from consideration, there was evidence that factual issues remain regarding the remaining balance on the policy. Although we are mindful of the logistical difficulties of calculating a premium from seven-year-old company records, this consideration does not alter our conclusion that there was evidence to preclude summary adjudication. See generally *Dixieland Truck Brokers v. Intl. Indem. Co.*, 210 Ga. App. 160 (435 SE2d 520) (1993).

Similarly, our conclusion is not altered, as Fidelity argues, by the fact that this policy was one of assigned risk. We are mindful that "[w]hile as a general rule, it is true that the premium to be charged on an insurance policy is an essential term of the contract which requires the mutual assent of the parties for validity, this element usually arises from negotiations between the parties, which is absent when insurance coverage is provided through an assigned risk plan, as in this case. . . . [I]t is apparent that insurance coverage under the assigned risk plan is not the subject of normal negotiations between contracting parties, but is made effective by operation of law to serve the best interests of the general public." (Punctuation omitted.) *Skipper v. Fireman's Fund Ins. Co.*, 212 Ga. App. 849, 850 (443 SE2d 302) (1994); see also *Rondale Bus Svc. v. American Cas. Co. &c.*, 189 Ga. App. 869, 871 (1) (377 SE2d 726) (1989). This rule does not negate the clear policy terms providing for a determination of the premium at the end of the policy period, because the question here is whether the *data* used for calculating the premium was appropriate, while this argument goes to the allowable *rates* themselves.

2. United argues that the court erred in failing to enter summary judgment in its favor since the three-year term for performing an audit expired in October 1993. We reject this argument, since there was evidence that Fidelity did request audit information before the expiration of the three-year period; moreover, there was evidence that United agreed to an audit. Given this evidence, the court's denial of the motion was proper because there were factual issues as to United's cooperation with the policy terms. See *Diamonds & Denims v. First of Ga. Ins. Co.*, 203 Ga. App. 681 (417 SE2d 440) (1992);

compare *KHD Deutz v. Utica Mut. Ins. Co.*, 220 Ga. App. 194 (469 SE2d 336) (1996).

Given our conclusion in Division 1, we need not reach United's argument regarding interest. See generally *C & H Couriers v. American Mut. Ins. Co.*, 170 Ga. App. 684, 685 (2) (318 SE2d 77) (1984).

### Case No. A96A1482

3. In its cross-appeal, Fidelity argues that the court erred in partially denying its motion for summary judgment and awarding only half of the amount it sought. For the reasons set forth above, we find this argument without merit and affirm the partial denial of Fidelity's motion.

*Judgment affirmed in Case No. A96A1482. Judgment reversed in Case No. A96A1481. Andrews and Smith, JJ., concur.*

DECIDED SEPTEMBER 19, 1996.

*Zachary & Segraves, J. Ed Segraves*, for appellant.
*Stokes, Lazarus & Carmichael, Richard J. Joseph*, for appellee.